UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

_____
)
SECURITIES AND EXCHANGE COMMISSION,   )
)
Plaintiff,   )
)
v.   )   Case No.
)
ERIC D. LYONS,   )
SYNCHRONY CAPITAL GP, LLC,   )
SYNCHRONY GROUP, LLC, and   )
SYNCHRONY CAPITAL GROUP,   )
)
Defendants,   )
)
and   )
)
SYNCHRONY GLOBAL MACRO, LP,   )
)
Relief Defendant.   )
_____)

**PLAINTIFF'S MEMORANDUM OF LAW
IN SUPPORT OF ITS EMERGENCY MOTION FOR A
TEMPORARY RESTRAINING ORDER, ORDER FREEZING ASSETS
AND ORDER FOR OTHER EQUITABLE RELIEF**

**Table of Contents**

INTRODUCTION...................................................................................................................1

STATEMENT OF FACTS ....................................................................................................3

I.   The Origin of Synchrony Capital and the Value Fund ...............................................3

II.  The Origin of the Capital Partners Fund and the Misappropriation of Its Assets. ...................5

III. The Catastrophic Losses of February 2018 and Their Aftermath ............................7

IV.  Misappropriation from the Value Fund and Transfer to the Global Macro Fund. ...................8

V.   The Offering Fraud Used to Replace Misappropriated Funds...................................9

VI.  Lyons' Admissions and Apparent Insolvency .........................................................12

VII. Remaining Fund Assets, Outstanding Redemption Requests ..................................13

ARGUMENT ......................................................................................................................14

I.   TEMPORARY RESTRAINING ORDER IS NECESSARY TO
     PROTECT INVESTORS AND THE PUBLIC INTEREST................................14

     A.  The Standard for Granting the Requested Temporary Restraining Order........14

     B.  The Commission Is Likely to Prevail on the Merits of Its Claims .................15

         1.  The Commission will likely be able to prove Lyons and the Synchrony
             Adviser Entities violated the Advisers Act.......................................15

         2.  The Commission will likely be able to prove Lyons and his Synchrony
             Adviser Entities violated Section 10(b) of the Exchange Act and Rule 10b-5
             Thereunder and Section 17(a) of the Securities Act....................................19

             i.   Misstatement liability under Exchange Act Section 10(b) and
                  Rule 10b-5(b), and Securities Act Section 17(a)(2)............................................21

             ii.  Scheme liability under Exchange Act Section 10(b) and Rule
                  10b-5(a) and (c), and Securities Act Sections 17(a)(1) and (3) ..........................24

     C.  Without an Injunction, the Funds' Investors Will Suffer Irreparable Harm ...................25

     D.  Balance of Harms Favors Issuance of the Temporary Restraining Order........................26

     E.  A Temporary Restraining Order Is In The Public Interest .............................................26

II.  ORDER FREEZING ASSETS AND ENTERING OTHER EQUITABLE
     RELIEF IS NECESSARY AND APPROPRIATE.............................................................27

     A.  The Need for an Asset Freeze and Prohibiting Acceptance of New Investments ...........27

     B.  The Need for an Accounting. .............................................................................................28

     C.  The Need for Order Preventing the Alteration or Destruction of Documents..................29

     D.  The Need for Expedited Discovery ...................................................................................29

CONCLUSION....................................................................................................................30

i

**Table of Authorities**

Supreme Court of the United States
*Lorenzo v. SEC*, Slip Opinion, No. 17-1077 (Mar. 27, 2019) ...............................................24 n.2
*Janus Capital Group v. First Derivative Traders*, 131 S.Ct. 2296 (2011) ............................ 19-20
*Basic v. Levinson*, 485 U.S. 224 (1988) .............................................................................. 19-20
*Aaron v. SEC*, 446 U.S. 680, 695 (1980) ....................................................................................20
*Transamerica Mortg. Advisors, Inc. v. Lewis*, 444 U.S. 11 (1979) .........................................15
*Ernst & Ernst v. Hochfelder*, 425 U.S. 185 (1976) ..................................................................20
*SEC v. Capital Gains Research Bureau, Inc.*, 375 U.S. 180 (1963) .........................................15

First Circuit Court of Appeals
*Micro Signal Research Inc. v. Otus*, 417 F.3d 28 (1st Cir. 2005) .............................................27
*Charlesbank Equity Fund II v. Blinds To Go, Inc.*, 370 F.3d 151 (1st Cir. 2004) ......................14
*In re Cabletron Sys. Inc.*, 311 F.3d 11 (1st Cir. 2002) ..............................................................20
*United Steel Workers of America, AFL-CIO v. Textron*, 836 F.2d 6 (1st. Cir. 1987) .................25

Other Circuit Courts of Appeal
*U.S. v. Tagliaferri*, 820 F.3d 568 (2d Cir. 2016) .....................................................................18
*SEC v. Monarch Funding Corp.*, 192 F.3d 295 (2d Cir. 1999) .................................................19
*SEC v. Steadman*, 967 F.2d 636 (D.C. Cir. 1992) ....................................................................18
*Steadman v. SEC*, 603 F.2d 1126 (5th Cir. 1979),
    *aff'd on other grounds*, 450 U.S. 91 (1981) .......................................................................15
*SEC v. Manor Nursing Ctrs., Inc.*, 458 F.2d 1082 (2d Cir. 1972) .............................................28
*SEC v. Frank*, 388 F.2d 486 (2d Cir. 1968) .............................................................................14

United States District Courts
*SEC v. Kingdom Legacy General Partner, LLC*, 2017 WL 417093
    (M.D. Fla. Jan. 31, 2017) ..................................................................................................18
*SEC v. Mannion*, 789 F. Supp.2d 1321 (N.D. Ga. 2011) .........................................................17
*Matter of Optimal U.S. Litig.*, No. 10 Civ. 4095,
    2011 WL 4908745, (S.D.N.Y. Oct. 14, 2011) ...................................................................20
*SEC v. Lee*, 720 F. Supp. 2d 305 (S.D.N.Y. 2010) ..................................................................24
*Valario v. U.S. Bank, N.A.*, No. 10-10529,
    2010 WL 2292471, (D. Mass. June 7, 2010) ....................................................................14
*R.J. Carbone Co. v. Regan*, 582 F. Supp. 2d 220 (D.R.I. 2008) ..............................................14
*Burnett v. Rowzee*, 561 F. Supp. 2d 1120 (C.D. Cal. 2008) .....................................................24
*SEC v. Eldrige*, 2007 WL 7654403 (N.D. Ga. Mar. 20, 2007) ...............................................17
*SEC v. Berger*, 244 F. Supp.2d 180 (S.D.N.Y. 2001) .............................................................16
*SEC v. Tandem Mgmt.*, 2001 WL 1488218 (S.D.N.Y. Nov. 21, 2001) .....................................17
*New England v. City of Manchester*, 2001 WL 531537 (D.N.H. 2001) .....................................24
*SEC v. Bremont*, 954 F. Supp. 726 (S.D.N.Y. 1997)................................................................28
*Sheldon Co. Profit Sharing Plan & Trust v. Smith*,
    828 F. Supp. 1262 (W.D. Mich. 1993) .............................................................................17
*SEC v. Oxford Capital Secs., Inc.*, 794 F. Supp. 104 (S.D.N.Y. 1992)....................................28

*SEC v. Musella*, 578 F. Supp. 425 (S.D.N.Y. 1984) ................................................... 14
*SEC v. Vesco*, 358 F. Supp. 1186 (S.D.N.Y. 1973) ..................................................... 14

Statutes
15 U.S.C. §77t(b) ......................................................................................................... 14
15 U.S.C. §77q(a) .................................................................................................... 19-20
15 U.S.C. §78j(b) .......................................................................................................... 19
15 U.S.C. §78u(d)(1) .................................................................................................... 14
15 U.S.C. § 80b-2(a)(11) .............................................................................................. 15
15 U.S.C. §80b-6(1)-(2) ............................................................................................... 15
15 U.S.C. §80b-6(4) ..................................................................................................... 18
15 U.S.C. §80b-9(d) ..................................................................................................... 14

Regulations
17 C.F.R. §240.10b-5 ............................................................................................... 19-20
17 C.F.R. §275.206(4)-8 ........................................................................................... 18-19

Commission Decisions
*Gaeton S. Della Penna*, Admin. Proc. File No. 3-16198,
    2015 WL 1389049 (Mar. 27, 2015) ....................................................................... 16
*Prohibition of Fraud by Advisers to Certain Pooled Investment Vehicles,*
    SEC Release No. 33-8766, IA-2628, 2007 WL 2234574 (Aug. 6, 2007) ............... 18
*John J. Kenny and Nicholson/Kenny Capital Mgmt.,* Rel. No. IA-2128,
    2003 WL 21078085 (May 14, 2003) ...................................................................... 16

## INTRODUCTION

Eric Lyons is an investment adviser and hedge fund manager. Since 2012, Lyons has formed, advised and managed three hedge funds. Lyons formed these funds as limited partnerships, advising and managing the funds through a general partner limited liability company, and selling shares of the limited partnerships to investors. These entities have all started with the name, "Synchrony."

Since 2017, Lyons and his Synchrony adviser entities have misappropriated approximately $570,000 from these hedge funds. In February 2018, the first two of these funds suffered catastrophic trading losses, totally wiping out one fund account (in fact leaving a $380,000 account deficit) and reducing the other fund account by seventy percent. Lyons subsequently formed a third hedge fund limited partnership and limited liability company adviser, and transferred the surviving fund's assets to it. Desperate to raise funds cover up his misappropriation, in August 2018 Lyons, acting through his third adviser, defrauded a local investor of $125,000 by selling the investor shares of his adviser based on false claims of an outstanding offer to invest $25 million in his newly formed hedge fund (there was no outstanding offer) and a representation that he would use the investor's $125,000 investment to operate the adviser and market the fund (in fact he used $100,000 of the investment to refund monies he had misappropriated from the fund that survived the February 2018 trading losses). Then, just last month, Lyons defrauded this investor again, selling him more shares of the third adviser for $175,000 based on false claim that a local private fund investor valued Lyons' hedged fund and investment strategy at $100 million (there was no such valuation). The Commission has a copy of the cancelled check from the victim, but neither Lyons, nor his adviser deposited it in any fund or adviser account. The Commission has information that Lyons has deposited this check

1

in a personal account.

As further detailed below, Lyons admitted during investigation testimony that he took some money from the funds (although much less than what the Commission eventually found) for personal expenses because he had no other source of income or assets to support himself. He took from the funds based on "existing need." Further, a review of Lyons' personal accounts shows that he is essentially insolvent. A temporary restraining order is necessary to halt any further misappropriation or offering fraud because, as a practical matter, it is highly unlikely that any current or future investor losses will be recoverable from these defendants. Two of the remaining fund investors are retirees.

The Commission now seeks a temporary restraining order to maintain the status quo for the protection of investors. The Commission seeks a preliminary injunction to stop Lyons and his Synchrony adviser entities from committing further acts of securities fraud, either through misappropriation of fund assets or through offering frauds in selling of shares of the fund's adviser. The Commission seeks an asset freeze to (1) freeze the remaining $120,000 of fund assets that is currently sitting in a bank account, and (2) freeze the defendants' assets to secure any misappropriated assets or ill-gotten gains from offering frauds. Further, the Commission seeks an accounting from defendants to (i) be able to calculate the investor losses from the misappropriation and accurately distribute the remaining assets to investors, (ii) calculate the ill-gotten gains received by the fund in being repaid through proceeds of an offering fraud, and (iii) identify any other victims who may have been offered and sold shares in the hedge fund advisers. The Commission seeks an order prohibiting defendants from accepting any new investments until a resolution of this action. Finally, the Commission seeks an order allowing expedited discovery and prohibiting the destruction of documents or other evidence.

2

.

## STATEMENT OF FACTS

**I.      The Origin of Synchrony Capital and the Value Fund**

Lyons and another individual founded the Synchrony hedge fund business in December 2012 with the formation of limited partnership investment structure with a limited liability company as the general partner to advise and manage the fund.  Declaration of William Donahue (hereinafter, "Donahue Decl."), ¶¶10, 16.  The limited partnership was called Synchrony Value Fund, LP (the "Value Fund") and its general partner/manager/adviser was called Synchrony Capital, LLC ("Synchrony Capital").  *Id.,* ¶¶8-10, 16  Although Lyons and the other owner initially founded this hedge fund business as an investment vehicle for the extended family of Lyons, Lyons himself was not an investor in his family's fund.  *Id.,* ¶17.  Rather, the family paid Lyons, through the fund, to serve as their investment adviser.  *Id.*

From 2012 to through the end of 2014, the only investors in the Value Fund were members of the Lyons family.  *Id.,*¶18.  During this period, the family's total investments were approximately $194,000.  *Id.*

In 2015, Lyons and his co-owner sold a twenty percent share of Synchrony Capital to a third person.  Donahue Decl., ¶9.  From 2015 through March 2018, the other two co-owners and other members of the Lyons family provided financial and operational support for Synchrony Capital on a part-time basis.  *Id.,* ¶19.  Lyons was the only full-time employee of Synchrony Capital.  *Id.,* ¶20.  He was also the sole investment manager of the Value Fund's investing activities.  *Id.*

During the "family fund" period of the Value Fund prior to 2015, the Lyons family paid Lyons's Synchrony Capital salary from funds taken directly from the Value Fund, rather than

from money paid to Synchrony Capital as part of a management fee for advising the fund. Donahue Decl., ¶21.  The Lyons family also used Value Fund monies for other Synchrony Capital expenses that are not normally paid directly by a fund.  *Id*.

In or about late 2016 or early 2017, an accountant for Synchrony Capital and the Value Fund discovered approximately $180,000 worth of these payments by the Value Fund that are not normally paid directly by a fund.  *Id.*, ¶22.  These expense payments included payments from the fund to pay Lyons.  *Id*. The accountant advised the members of Synchrony Capital (Lyons and the other two individual owners) to execute a promissory note in the amount of $140,000 to reimburse the fund for these expenses.  *Id*.  He also advised them to pay the other $40,000 over time as an unsecured loan.  *Id*.  On or about February 2017, Lyons and the other two co-owners of Synchrony Capital executed a promissory note to pay the Value Fund $140,000.  *Id*.

Starting in approximately January 2015, Synchrony Capital and its members offered Value Fund subscriptions to potential investors outside the Lyons family and began receiving investments from these offers.  *Id.*, ¶23.  From January 2015 to January 2018, Lyons and the other members of Synchrony Capital raised approximately $2.5 million in investor contributions from approximately seven investors who were not family members of Lyons or otherwise related to Synchrony Capital.  *Id*.

Prior to investing in the Value Fund, these seven non-family member investors received fund offering documents, including a Private Placement Memorandum and a Limited Partnership Agreement.  *Id.*, ¶24.  These Value Fund offering documents represented to investors that invested funds would be used in the limited partnership's stated purpose of investing in securities.  *Id.*, ¶25.  Synchrony Capital charged Value Fund investors a management fee at the rate of two percent per year on assets under management, which would be taken from the fund in

monthly installments. *Id.*, ¶26. It also charged an annual performance fee of 20% on profits (meaning that for all profits on investments, investors would get 80% and Synchrony Capital would get 20%). *Id.*

The non-family investors included a representative of a business located in the Czech Republic, which contacted Eric Lyons about a potential investment. *Id.*, ¶27. From early 2016 to early 2018, this Czech investor invested approximately $1,850,000 in the Value Fund. *Id.*, ¶28. By the end of 2017, the Value Fund held assets in the approximate amount of $2.4 million. *Id.*, ¶29. Effective February 1, 2018, the Value Fund received additional contributions of $430,000 from two of its then existing investors who were not Lyons family members. *See* Declaration of Susan Curtin (hereinafter, "Curtin Decl."), Ex. 5 (administrator email showing cash deposits effective Feb. 1, 2018).

## II.      The Origin of the Capital Partners Fund and the Misappropriation of Its Assets

In or around May 2017, Lyons started negotiating with the Czech investor about forming a new private fund separate from the Value Fund. Donahue Decl., ¶30. The Czech investor told Lyons that this new fund would need to be invested conservatively because it planned for a close and personal client of the Czech investor to invest in the fund. *Id.* The Czech investor also wanted to acquire fifty percent ownership of the fund's newly formed investment adviser in exchange for investing $100,000 in the fund alongside its client. *Id.*

Without informing the other members of Synchrony Capital, Lyons agreed to start a new private fund called the Capital Partners Fund and to share equal ownership of the fund manager in exchange for an initial $100,000 investment in the fund by Czech investor itself. *Id.*, ¶31. Lyons created Synchrony Capital Group as the general partner of the Capital Partners Fund. *Id.*, ¶32. The general partner was the manager and adviser to the fund and would receive

management and performance fees from the Capital Partners Fund.  *Id.*, ¶¶32, 35.  And consistent with his agreement with the Czech investor, Lyons sold it a 50% interest in Synchrony Capital Group in exchange for its investment of $100,000 to seed the new fund.  *Id.*, ¶32.

Lyons and Synchrony Capital Group emailed the Czech investor offering documents for the Capital Partners Fund limited partnership.  *Id.*, ¶34.  These documents stated that the fund would be managed by Synchrony Capital Partners, LLC, which would receive a management fee at the rate of 2% per year on assets under management, taken in monthly installments.  *Id.*, ¶35.  The offering documents also represented that the private partnership would operate as an investment partnership, investing in securities.  *Id.*, ¶36.  The offering documents represented that funds provided by an investor would be placed in the custody of financial institutions and brokerage firms under appropriate arrangements.  *Id.*, ¶37.  Lyons also opened a brokerage account and bank accounts in the name of Synchrony Capital Group and the Capital Partners Fund.  *Id.*, ¶50-51.  Lyons had control of these accounts, the Czech investor and its client did not.  *Id.*

After Lyons and the Czech investor signed the fund offering documents, the Czech investor sent Lyons and Synchrony Capital Group the initial seed $100,000 to be invested in the Capital Partners fund, which was deposited the Capital Partners Fund bank account in June 2017.  *Id.*, ¶39; Declaration of Rory Alex (hereinafter "Alex Decl."), ¶9.  Following the first investment, the Czech investor's client sent Lyons and Synchrony Capital Group his investment of approximately $600,000 in September 2017, which was deposited in the Capital Partners Fund bank account.  Donahue Decl., ¶40; Alex Decl., ¶10.

As soon as Lyons and Synchrony Capital Group received the Czech investor's first investment in June 2017, they began misappropriating the funds.  Alex Decl., ¶14-15.   In total,

6

during 2017 and 2018, Lyons and Synchrony Capital Group misappropriated approximately $320,000 from the Capital Partners Fund by transferring cash from the fund's bank account to Lyons's bank account or using the fund's cash for Lyons' personal expenses. *Id.*, ¶14. The personal spending included $10,000 on piano expense and over $6,000 on designer clothing. *Id.*, ¶15.

### III.    The Catastrophic Losses of February 2018 and Their Aftermath.

By early February 2018, Lyons made significant options trades in the brokerage accounts of the Value and Capital Partners funds that were levered to perform based on the performance of the S&P 500 Index. Donahue Decl., ¶41. During the first week of that month, the index declined. Alex Decl., ¶16. As a result, on or about February 5, 2018, the options held by the funds caused steep declines in the total value of the funds' brokerage accounts. Id.,¶¶16-17. Because of the steep declines in account values, the funds' broker traded the positions in the Value Fund's account to halt the account losses. Donahue Decl., ¶42. For the Capital Partners account, the broker demanded that the fund either provide additional collateral or the broker would trade the options in the market to prevent further loss in value. *Id.* The Capital Partners Fund did not meet the broker's call for additional collateral. As a result, the broker traded the positions, halting and setting the funds' losses. *Id.*

For the Capital Partners Fund, all of its investments were wiped out and the brokerage account was left with an approximate negative $380,000 balance, meaning that Capital Partners Group owed the brokerage firm $380,000. *See* Alex Decl., ¶17. For the Value Fund, the closing of these positions caused the fund's value to drop by approximately seventy percent for the month of February. *Id.*,¶16. The fund's assets dropped from approximately $3 million to

approximately $1 million.   *See id.*, Ex. H (Value Fund Statement) at 1 (Total from $2.78 million to $808,683).

Lyons informed the other two co-owners of Synchrony Capital about the Value Fund's loss. Donahue Decl., ¶43.  In the following months of February and March 2018, the other two co-owners negotiated their exit from Synchrony Capital with Lyons.  *Id.*, ¶44.  They transferred their ownership interests to Lyons, giving him 90% ownership of the company.  *Id.*, ¶45.  By that time, the other two co-owners had paid off their share of the $140,000 promissory note owed to the Value Fund as well as their share of the $40,000 unsecured loan.  *Id.*, ¶44.  Lyons, however, still owed approximately $17,500 on promissory note and $20,500 on the unsecured loan.  *Id.*

Lyons and Synchrony Capital also informed the Value Fund's largest investor, the Czech investor, about the fund losses.  *Id.*, ¶46.  As a result, the Czech investor requested redemption of its investment in the Value Fund.  *Id.*  Lyons and Synchrony Capital fulfilled that redemption request by paying the investor what purported to be the remaining value of its investment.  *Id.*

## IV.   **Misappropriation from the Value Fund and Transfer to the Global Macro Fund**

Soon after the other two co-owners departed Synchrony Capital at the end of March 2018, Lyons began misappropriating funds from the Value Fund to pay Lyons' personal expenses. *See* Alex Decl., ¶20.  These personal expenses included, $9,000 on sailing activities, approximately $6,500 on entertainment expenses, including tickets to a Taylor Swift concert, and $2,000 on summer camp fees. *Id.*, ¶15.

In June 2018, Lyons and Synchrony Capital set up the Synchrony Capital Global Macro Fund and, as its general partner and manager, Synchrony Capital GP, LLC.  Donahue Decl., ¶47. Lyons opened bank and brokerage account for these entities, for which he was the authorized user. *Id.*, ¶¶50-51.  In October 2018, Lyons and Synchrony Capital transferred the assets of the

Synchrony Value Fund to the Global Macro Fund.  *Id.*, ¶49; Alex Decl., ¶19.  Since 2018, Lyons,

Synchrony Capital, and Synchrony Capital GP have misappropriated approximately $250,000

from the Value Fund and the Global Macro Fund.  Alex Decl., ¶20.

**V.     The Offering Fraud Used to Replace Misappropriated Funds**

In August 2018, Lyons approached an investor (hereinafter "Investor A") about

purchasing an ownership interest in Synchrony Capital GP.  *See* Donahue Decl., Ex. 1

(Declaration of Investor A, hereinafter "InvA Decl."), ¶6.  By 2018, Lyons and Investor A had

known each other for several years.  *Id.*, ¶4.  And, over the years, Lyons had talked to Investor A

about Synchrony Capital and the hedge fund that it and Lyons advised and managed.  *Id.*, ¶5.

Lyons, on behalf of Synchrony Capital GP, offered Investor A an ownership interest in

Synchrony Capital GP in exchange for a cash investment.  *Id.*, ¶6.  Specifically, they offered

Investor A ten percent of the adviser's "class B shares" in exchange for a payment of $125,0000

from Investor A.  *Id.*  Lyons offered Investor A these securities to make Investor A a "silent

partner," meaning Investor A would have no role in the operation of the business, but profit from

the investment through Lyons' and Synchrony Capital GP's efforts.  *See* Donahue Decl., Ex. 1,

Lyons Tr., 113:114:4.   In their negotiations, Lyons and Investor A communicated by electronic

mail, including exchanging drafts of written agreements. Supplemental Declaration of William

Donahue (hereinafter "Donahue Supp."), ¶7.

To entice Investor A's investment, Lyons and Synchrony Capital GP provided Investor A

with a spreadsheet calculating the returns Investor A would receive from monthly management

fees on the adviser's assets under management.  Donahue Decl, Ex. 1 (InvA Decl.), ¶7.  Lyons

and Synchrony Capital GP told Investor A that a well-known private investor group had an

outstanding offer to invest $25 million  in the Global Macro Fund and that, based on this

9

investment, Investor A could expect monthly income of approximately $11,000 from management fees in the months to come. *Id.*

This representation of a $25 million offer was false. According to representatives from this private investor group, a person from this group met with Lyons once or possibly two times. Donahue Supp., ¶11. This person did not make an offer on behalf of the firm to invest $25 million with any Synchrony related entity or fund in August 2018. *Id.*, ¶12. Although it is possible that the firm representative who met with Lyons might have inquired if Synchrony Capital GP would be open to a "seed" investment deal, such a discussion would have been introductory in nature and not an offer to invest. *Id.*, ¶13. The person who met with Lyons was not authorized to make an offer on behalf of the firm without management approval, and he never sought or received such approval. *Id.*, ¶12.

In August 2018, Lyons and Synchrony Capital GP also told Investor A that his money would be used to operate Synchrony Capital GP and its management and marketing of the Global Macro Fund. In actuality, Lyons intended to, and did, divert $100,000 (out of Investor A's investment of $125,000) to back fill monies that Lyons had previously misappropriated from the Value Fund. Alex Decl., ¶23; Donahue Decl., Ex. 1 (Lyons IT), 95:7-99:3 (admitting to using $100,000 obtained from Investor A to repay fund).

Following these misrepresentations, Investor A gave Lyons $125,000 for investment in Synchrony Capital GP and ten percent of the adviser's class B shares. InvA, ¶8.

In March 2019, Lyons came to Investor A's house and solicited him for another investment in Synchrony Capital GP. Donahue Decl, Ex. 1 (InvA Decl.), ¶10. To persuade Investor A to invest this time, Lyons and Synchrony Capital GP told Investor A that they were in urgent need for an additional investment of $165,000 because Synchrony Capital GP's

accountant had told Lyons the company needed this money to repay certain inter-company loans. *Id*.

This statement was false. As Lyons knew, the inter-company loan story was based on an issue that had been raised by Synchrony Capital's accountant approximately two years earlier concerning the Value Fund. Donahue Decl., ¶22. He also knew that the other two co-owners of Synchrony Capital had already substantially paid down that debt prior to their resignation from Synchrony Capital. *Id.*, ¶44. He further knew that Synchrony Capital GP was a different company from Synchrony Capital.

To persuade Investor A to invest, Lyons and Synchrony Capital GP further told Investor A that an experienced private fund investor had valued the Synchrony hedge fund business and its investment strategy at $100 million. Donahue Decl, Ex. 1 (InvA Decl.), ¶11. This statement was false. According to this private fund investor, he had become aware of Synchrony Capital, LLC and Eric Lyons through his employment as a managing director at a private investment fund that invested in hedge funds. Donahue Supp., ¶19. As part of his duties and responsibilities, this private fund investor was charged with looking at newer hedge funds and seeding them. *Id.*, ¶20. In this regard, he met with hundreds of firms like Synchrony Capital. *Id*. After learning more about Synchrony Capital, this person believed the firm did not seem large enough or of sufficient institutional quality for his employer to invest. *Id.*, ¶21. The private fund investor thought that maybe within three to five years Synchrony Capital might grow large enough to attract institutional business, but not at that time. *Id*. While he may have met with Synchrony Capital and Lyons "at a high level," and may have mentioned Synchrony Capital to his bosses, Synchrony Capital never made it to any advanced stage of consideration for investment purposes. *Id.*, ¶22. According to this private fund investor, he never provided

11

Lyons or Synchrony Capital with any analysis valuing Lyons' or Synchrony Capital's investment strategy at $100 million.  *Id.*, ¶23.

Despite this private fund investor's decision not to invest in Synchrony, this person became acquaintances with Lyons and stayed in touch with him over the years since meeting him.  Donahue Supp., ¶24.  On occasion, Lyons asked this person for feedback regarding how to make Synchrony more attractive to institutional type investors.  *Id*.  The private fund investor informed Lyons that he needed to "systematize" Synchrony's trading and make it more of a quantitative process, so that institutional investors wouldn't feel like they were merely "betting on some guy making bets."  *Id*.  This person said he had met with Lyons a few weeks ago on April 5, 2019, and that Lyons had said he was working with "some math guy" to systematize the quantitative process.  *Id.*, ¶25.

## VI.   Lyons' Admissions and Apparent Insolvency

On April 3, 2019, Commission staff took Lyons' testimony.  During this testimony, the staff asked if the Value Fund ever provide him or Synchrony Capital with anything of value other than a management fee or performance fee.  Donahue Decl., Ex. 1 (Lyons Investigation Testimony, hereinafter "Lyons IT"), 84:3-76.  At first, he said, "no."  *Id.,* 84:7.  Then, after a break, he returned and "clarified" that he "borrowed" money from the fund.  *Id.*, 85:10-24.  At that point, Lyons admitted to taking approximately $80,000 to $90,000 from the Value Fund between June and December 2018.  *Id.*, 85:18-87:11.  Lyons claimed that he "borrowed" the monies because he did not have any source of revenues to pay his personal expenses.  *Id.*, 87:5-11; 89:8-19.   Lyons said he used the monies he took to pay his rent and other household expenses, a lease for his car, credit card debt, food, and summer camp fees for his children.  *Id.*, 91:4- 93:1-25.   He also said that he did not seek a bank loan because he did not have significant

collateral to secure a loan.  *Id.*, 250:24-251:19.

During its investigation, the Commission subpoenaed Lyons' personal bank account records.  Donahue Decl., ¶52.  As of March 31, 2019, these bank accounts records show accounts that are overdrawn or have been closed.  Alex Decl., ¶22.  One account shows a balance of $500.  Another statement shows a negative balance of approximately -$600.  *Id.*  He is essentially insolvent.

## VII.    Remaining Fund Assets, Outstanding Redemption Requests

As of April 12, 2019, the Global Macro Fund, the only remaining fund holdings assets, held only approximately $120,000 in investor funds.  Alex Decl., ¶21.  These funds are currently held in a bank account, not in a trading account.  *Id.*  Indeed, these funds have not been in a trading account since March 5, 2019, when the fund's broker terminated its relationship with the fund and closed its account.  *Id.*

The Commission interviewed four Value Fund investors whose assets Lyons and Synchrony Capital transferred to the Global Macro Fund.  Curtin Decl., ¶¶7-31.  Two of these investors are retired.  *Id.*, ¶¶15, 22.  Based upon information they received from either Lyons or his adviser entities, these investors believe they have accounts valued at approximately $227,000 – or approximately $100,000 more than what is actually in the Global Macro bank account.  *Id.*, ¶13 & Ex.4 ($62,492),  ¶18 & Ex.6 ($82,097),  ¶24 & Ex.8 ($44,848),  ¶¶29, 31 ($39,000 or $40,000).  Two of these investors have requested Lyons to return their investment, but he has not fulfilled these requests.  *Id.*, ¶¶13-14, 20.

## ARGUMENT

**I.    A TEMPORARY RESTRAINING ORDER IS NECESSARY TO PROTECT INVESTORS AND THE PUBLIC INTEREST**

### A.  The Standard for Granting the Requested Temporary Restraining Order

Section 209(d) of the Investment Advisers Act of 1940 ("Advisers Act") [15 U.S.C. §80b-9(d)], Section 20(b) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. §77t(b)], and Section 21(d)(1) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. §78u(d)(1)] provide that a court shall enter a temporary restraining order or preliminary injunction in a Commission enforcement action upon a proper showing of federal securities law violations.   The showing required by the statute, which focuses on the likelihood of establishing a securities law violation, should be based on "reasonable inquiry and other credible information."   *SEC v. International Loan Network, Inc.,* 770 F. Supp. 678, 688 (D.D.C. 1991), *aff'd,* 968 F.2d 1304 (D.C. Cir. 1992).   The Court has broad discretion to consider evidence by affidavit rather than live testimony.   *See, e.g., SEC v. Frank*, 388 F.2d 486, 490 (2d Cir. 1968); *SEC v. Musella*, 578 F. Supp. 425, 427 (S.D.N.Y. 1984); *SEC v. Vesco*, 358 F. Supp. 1186, 1188 (S.D.N.Y. 1973).

In deciding whether to issue a temporary restraining order and a preliminary injunction, courts in the First Circuit weigh four well-established factors: (i) the likelihood of success on the merits; (ii) the potential for irreparable harm if the injunction is denied; (iii) the balance of harm suffered by the movant if the injunction is denied weighed against that suffered by the nonmovant if the injunction is granted; and (iv) the public interest.   *See Charlesbank Equity Fund II v. Blinds To Go, Inc.,* 370 F.3d 151, 162 (1st Cir. 2004); *Valario v. U.S. Bank, N.A.,* No. 10-10529,  2010 WL 2292471,  at *2 (D. Mass. June 7, 2010); *R.J. Carbone Co. v. Regan,* 582 F.

Supp. 2d 220, 224 (D.R.I. 2008).  Here, each of the four factors weighs in favor of granting the requested injunction.

### B.  The Commission Is Likely to Prevail on the Merits of Its Claims.

1.   *The Commission will likely be able to prove Lyons and his Synchrony Adviser Entities violated the Advisers Act.*

In its First Claim for relief, the Commission alleges that Lyons and his Synchrony Adviser Entities violated section 206(1) and (2) of the Advisers Act. These sections prohibit fraudulent conduct by investment advisers.  Section 206(1) prohibits any investment adviser from employing any device, scheme, or artifice to defraud any client or prospective client.  15 U.S.C. §80b-6(1).  Section 206(2) prohibits any transaction, practice or course of business which operates as a fraud or deceit upon any client or prospective client.  *Id.*, §80b-6(2).  Scienter is required to prove a violation of 206(1), but not for a violation of 206(2).  *See Steadman v. SEC*, 603 F.2d 1126, 1134 (5th Cir. 1979) (noting scienter is not required under Section 206(2), but is required under 206(1)).

Under the Advisers Act, investment advisers owe a fiduciary duty to their clients. *Transamerica Mortgage Advisors, Inc. v. Lewis*, 444 U.S. 11, 17 (1979); *SEC v. Capital Gains Research Bureau, Inc.*, 375 U.S. 180, 191 (1963).  The United States Supreme Court has defined this duty to include "an affirmative duty of utmost good faith, and full and fair disclosure of all material facts."  *Capital Gains Research Bureau*, 375 U.S. at 191-94.

In committing the acts alleged in his complaint, Lyons and this Synchrony Adviser Entities acted were investment advisers who owe this fiduciary obligation.  An investment adviser means "any person who, for compensation, engages in the business of advising others . . . as to the value of securities or as to the advisability of investing in, purchasing, or selling securities . . . ." 15 U.S.C. §80b-2(a)(11).  Compensation includes not only management fees,

but also, in the case of misappropriation, money taken by an adviser as an illegal form of compensation. *See Gaeton S. Della Penna*, Admin Proc. File No. 3-16198, 2015 WL 1389049, at *3 (Mar. 27, 2015) (misappropriation of investor funds is compensation for purposes of acting as an investment adviser) (*citing Alexander V. Stein*, Advisers Act Release No. 1497, 1995 WL 358127, at *2 & n.13 (June 8, 1995)).   An individual associated with an investment adviser can be charged as a primary violator under 206 when he controls the adviser and/or engages in activities sufficient to meet the broad definition of "investment adviser" set forth in Section 202(a)(11). *See SEC v. Berger*, 244 F. Supp.2d 180, 193 (S.D.N.Y. 2001) (individual that controls investment adviser and its decision making is an investment adviser under the Advisers Act); *John J. Kenny and Nicholson/Kenny Capital Mgmt.,* Rel. No. IA-2128, 2003 WL 21078085 (May 14, 2003).

Here, each of the Synchrony Adviser Entities was the general partner to the hedge fund limited partnership.   In that role, they acted as the adviser and manager of the funds, and received management and performance fees for their investment management activities, or took misappropriated monies as a form of unlawful compensation.   Donahue Decl., ¶¶24-26, 34-35; Alex Decl., ¶¶14-15, 20.   At the time of the misconduct, Lyons was in sole control of each adviser's investment advisory operations and received compensation based on either management fees or misappropriated fund monies.   *See* Donahue Decl., ¶20 (Lyons only full-time employee of Synchrony Capital, and sole investment manager of Value Fund investing activities), ¶¶41-45 (at end of March 2018 Lyons became 90% owner of Synchrony Capital after two co-owners abandon fund); Alex Decl., ¶¶14-15, 20 (detailing misappropriation from Value Fund); Donahue, ¶¶31-32, 50-51 (Lyons formed Capital Partners GP without knowledge of other members of Synchrony Capital, held exclusive control of brokerage and bank accounts); Alex

Decl., ¶¶14-15 (detailing misappropriation from Capital Partners Fund); Donahue Decl., ¶¶47, 50-51 (Lyons forms Global Macro Fund and has exclusive control of bank and brokerage account); Alex Decl., ¶20 (explaining total misappropriated from Value and Global Macro funds).

With regard to the breach of the fiduciary obligation owed, there is no question that misappropriation of fund monies for personal expenses is a fraud or deceit on Lyons' and his adviser entities' clients. It is a classic violation of Sections 206(1) and 206(2). *See, e.g.*, *SEC v. Mannion*, 789 F. Supp.2d 1321, 1341 (N.D. Ga. 2011) (Advisers Act "obligates Defendants to act for benefit of the Fund, rather than diverting assets for personal use"); *SEC v. Eldridge*, 2007 WL 7654403, at *9 (N.D. Ga. Mar. 20, 2007) (misappropriating investor funds for advisers' benefit "in and of itself established the requisite state of mind for securities fraud"); *SEC v. Tandem Mgmt.*, 2001 WL 1488218, at *10 (S.D.N.Y. Nov. 21, 2001); *Sheldon Co. Profit Sharing Plan & Trust v. Smith*, 828 F. Supp. 1262, 1284 (W.D. Mich. 1993). And, there is no question that Lyons and his adviser entities misappropriated fund assets. Lyons admitted to taking fund monies for personal expenses because he did not have any other sources of income. Donahue Decl., Ex. 1 (Lyons IT), 87:5-11; 89:8-19. And, although Lyons initially claimed, under oath, that he took only $80,000 to $90,000 from the Value Fund, *id.*, 85:18-87:11, subsequent investigation by the Commission staff has determined that the misappropriation was much larger than that – approximately $320,000 misappropriated from the Capital Partners Fund and $150,000 from the Value Fund and Global Macro Fund.

In its Second Claim for relief, the Commission alleges that Lyons and his Synchrony Adviser Entities violated section 206(4) of the Advisers Act and Rule 206(4)-8 thereunder. Section 206(4) of the Advisers Act prohibits an investment adviser from directly or indirectly

engaging in any act, practice or course of business which is fraudulent, deceptive, or

manipulative.   15 U.S.C. §80b-6(4).   Rule 206(4)-8 defines such prohibited conduct to include

making false or misleading statements (206(4)-8(a)(1)) or otherwise defrauding or deceiving

(206(4)-8(a)(2)) investors or prospective investors in pooled investment vehicles that the adviser

manages, including registered investment companies, private funds, and other types of pooled

vehicles that invest in securities.   17 C.F.R. §275.206(4)-8;  *see Prohibition of Fraud by Advisers

to Certain Pooled Investment Vehicles,* SEC Release No. 33-8766, IA-2628, 2007 WL 2234574

(Aug. 6, 2007).   Violations of Section 206(4) and Rule 206(4)-8 thereunder do not require proof

of scienter.  *See SEC v. Steadman*, 967 F.2d 636, 647 (D.C. Cir. 1992);  *see also SEC v. Kingdom

Legacy General Partner, LLC*, 2017 WL 417093, at *8 (M.D. Fla. Jan. 31, 2017);  *but see U.S. v.

Tagliaferri*, 820 F.3d 568, 574 (2d Cir. 2016) (holding that a criminal conviction under Advisers

Act Section 206 does not require proof of intent to harm and noting that "willfully 'engag[ing] in

any act, practice, or course of business, which is fraudulent, deceptive or manipulative'  . . .

requires, at minimum, intent to deceive") (brackets in original, citing Advisers Act Section

206(4)).

Lyons and his adviser entities violated Section 206(4) and Rule 206(4)-8 thereunder by

making numerous misstatements and omissions to investors in pooled investment vehicles, here

the Synchrony funds – the Value Fund, the Capital Partners Fund, and the Global Macro Fund.

For example, Lyons and Synchrony Capital Group told the Czech investor, in writing, that its

funds invested with the Capital Partners Fund would be used for investment purposes and that its

investment monies would be held in custody accounts of financial institutions and brokerage

firms.  Donahue Decl., ¶¶34-37.  They failed to disclose that investor funds would be

misappropriated for personal use, which rendered disclosures concerning the use and custody of

18

investor assets materially misleading in violation of Rule 206(4)-8(a)(1).  As another example, on February 19, 2018, Synchrony Capital sent a Value Fund investor an email attaching "a memo from Eric Lyons regarding the Stock Market's tumultuous ride the last few weeks." Curtin Decl., ¶¶7-11 & Ex.3.  The attached memo from Lyons describes an "unprecedented move in the VIX" index on February 5, 2018, and states "[w]e believe the values within our current portfolio are extremely compelling and that we are well-positioned to capture the opportunity sets that exist in the global markets." This memo is patently misleading, however, because it fails to describe, or even mention, how the move in the VIX or put options in the Value Fund's portfolio caused the Value Fund and Mr. Owusu's investment in the Value Fund to plummet by approximately 70% on February 5, 2018. *Id.* Finally, the long-term misappropriation of assets from multiple funds was a course of business that operated as a fraud on the funds' investors under Rule 206(4)-8(a)(2). *See* 17 C.F.R. §275.206(4)-8(a)(2) (prohibiting any investment adviser to a pooled investment vehicle from engaging in any fraudulent course of business).

   2.  *The Commission will likely be able to prove Lyons and his Synchrony Adviser Entities violated Section 10(b) of the Exchange Act and Rule 10b-5 Thereunder and Section 17(a) of the Securities Act.*

   Section 17(a) of the Securities Act prohibits fraud "in the offer or sale of securities," and Section 10(b) of the Exchange Act and Rule 10b-5 thereunder prohibit fraud "in connection with the purchase or sale of securities." 15 U.S.C. §77q(a); 15 U.S.C. §78j(b); 17 C.F.R. §240.10b-5. Specifically, Exchange Act Rule 10b-5(b) prohibits "making" any untrue statement of material fact or omitting to state a material fact, 17 C.F.R. §240.10b-5(b), while Securities Act Section l7(a)(2) prohibits obtaining money or property "by means of" any untrue statement or omission of material fact. 15 U.S.C. §77q(a)(2); *see, e.g., Basic, Inc. v. Levinson,* 485 U.S. 224, 235 n.13

(1988); *SEC v. Monarch Funding Corp.,* 192 F.3d 295, 308 (2d Cir. 1999).  For purposes of Rule 10b-5(b), the "maker" of a statement is the person or entity with ultimate authority over the statement, including its content and whether and how to communicate it.  *Janus Capital Group v. First Derivative Traders,* 131 S.Ct. 2296, 2302 (2011); *Matter of Optimal U.S. Litig.,* No. 10 Civ. 4095, 2011 WL 4908745, at *2 (S.D.N.Y. Oct. 14, 2011).

Exchange Act Rules 10b-5(a) and 10b-5(c) prohibit "employing any device, scheme or artifice to defraud" and "engaging in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person." 17 C.F.R. §240.10b-5(a), (c).  Similarly, Securities Act Sections 17(a)(1) and 17(a)(3) prohibit "employing any device, scheme or artifice to defraud" and "engaging in any transaction, practice, or course of business which operates or would operate as a fraud or deceit upon any purchaser" of a security.   15 U.S.C. §77q(a)(1), (3).

A showing of scienter is required to establish a violation of Section 17(a)(1); negligence is sufficient under Sections 17(a)(2) and (3).  *Aaron v. SEC,* 446 U.S. 680, 695, 697 (1980).  To establish a violation of Section 10(b) of the Exchange Act and Rule 10b-5 thereunder, the Commission must prove that the defendant acted with scienter.  Scienter has been defined as "a mental state embracing intent to deceive, manipulate or defraud." *Ernst & Ernst v. Hochfelder,* 425 U.S. 185, 193 (1976).  In the First Circuit, scienter may be established by showing extreme recklessness.  *In re Cabletron Sys. Inc.,* 311 F.3d 11, 38 (1st Cir. 2002) (scienter may be established by indirect evidence, and "may extend to a form of extreme recklessness").  The Commission must also prove that the misrepresented or omitted facts and other fraudulent conduct were material, meaning there is a "substantial likelihood" that the misrepresented or omitted fact "would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available."  *Basic,* 485 U.S. at 231-32.  Thus, a fact is

20

material if there is a substantial likelihood that a reasonable investor would consider it important in making an investment decision. *See Basic*, 485 U.S. at 231. The "in connection with" requirement of Section 10(b) and Rule 10b-5 thereunder is satisfied if the fraud touches upon a securities transaction. *See SEC v. Zandford*, 535 U.S. 813, 819-20 (2002).

i.      *Misstatement liability under Exchange Act Section 10(b) and Rule 10b-5(b), and Securities Act Section 17(a)(2)*

Lyons and his Synchrony Adviser Entities violated Section 10(b) and Rule 10b-5(b) thereunder by knowingly making materially false and misleading statements in light of representations made and actual facts that were omitted from those representations to investors in connection with the sale of securities.

In connection with the sale of Global Macro Fund shares, Lyons and Synchrony Capital Group distributed fund offering documents to the Czech investor that said that invested monies would be used for investment purposes and would be held in custody accounts of financial institutions and brokerage firms. Donahue Decl., ¶¶34-37. These statements were obviously false in light what Lyons and Synchrony Capital Group actually did when they once they received the Czech's investment. Lyons and Synchrony Capital Group received the first $100,000 investment in June 2017, *id.*, ¶39, Alex Decl., ¶9, and started misappropriating funds in June as soon as they received it. Alex Decl., ¶¶14-15. Lyons' and Synchrony Capital Group's intention to misappropriate these funds was a material fact that any reasonable investor would consider an important factor in whether to invest.

In the sale of Synchrony Capital GP's "class B" shares in August 2018 and March 2019, Lyons and Synchrony Capital GP knowingly made a series of materially false and misleading statements to Investor A. For example, in connection with the sale in August 2018, Lyons and Synchrony Capital told Investor A that they had an outstanding offer of $25 million to invest in

21

the Global Macro Fund from a well-known private fund investor group. InvA, ¶7. This representation was false. Donahue Decl,, ¶¶11-13. It was also material. The purported $25 million offer to invest was the *sole* basis on which Lyons and Synchrony Capital GP claimed an ability to pay Investor A an income of $11,000 per month. InvA, ¶7. Similarly, in connection with the sale of class B shares in March 2019, Lyons and Synchrony Capital GP told Investor A that an experienced private fund investor had valued the Synchrony hedge fund business and its investment strategy at $100 million. *Id.*, ¶11. This statement was false. Donahue Decl., ¶¶19-23. And, it was also material. In reality, this experienced investor had turned down an investment in Synchrony's hedge fund because of its lack of size and institutional quality, and had never valued the business or its investment strategy at all. *Id.* These details, which rendered Lyons representation false, would have been important factors in any reasonable investor's decision whether to invest.[1]

Lyons knew his misrepresentations and omissions were false and misleading because he was directly involved with both the making of the statements and the conduct that rendered them false and misleading. *See* Donahue Decl., ¶¶34, 5051 (Lyons emailing offering documents to Czech investor and opening accounts under his control), Alex Decl., ¶¶14-15 (Lyons' use of Capital Partners Fund monies); Donahue Decl, Ex. 1 (InvA Decl.), ¶¶7, 11 (describing Lyons' representations of $25 million investment offer and $100 million valuation); Donahue Supp., ¶¶8-17 (describing private investor group's explanation of meetings with Lyons and lack of investment offer made), *id.*, ¶¶19-25 (describing private fund investor's explanation of meetings with Lyons and lack of valuation). And, as the owner and person exercising control over the

---

[1] As set forth in the Statement of Facts, Section V, *supra*, Lyons and his Synchrony adviser entities made more false and misleading statements of fact than argued here. For the sake of brevity, the Commission has limited its written argument to those discussed here, but counsel is prepared to offer oral argument on the other misrepresentations set forth in the facts section and the supporting declarations, if necessary.

Synchrony adviser entities, Lyons' scienter is imputed to them. *See, e.g., In re Cabletron Sys.*, 311 F.3d 11, 40 (1st Cir. 2002); *SEC v. Manor Nursing Ctrs., Inc.*, 458 F2d 1082, 1089 n.3 (2d Cir. 1972). Further, Lyons and his adviser entities "made" the false and misleading statements because they held the ultimate authority over the statements that were communicated to investors, including when and how those statements were communicated. *See* Donahue Decl., ¶¶34, 50-51 (Lyons emailing offering documents to Czech investor and opening accounts under his control); Donahue Decl, Ex. 1 (InvA Decl.), ¶¶7, 11 (describing Lyons' representations of $25 million investment offer and $100 million valuation).

Finally, Lyons and his adviser entities also violated Section 17(a)(2) of the Securities Act because they used these false and misleading statements to obtain money in the sale of fund shares and Synchrony Capital GP's class B shares. Section 17(a)(2) imposes liability where the defendant, either directly or indirectly, obtains money by means of any false statement of material fact or omission of any materially misleading fact. 15 U.S.C. §77q(a)(2). Liability under Section 17(a)(2) extends to agents who obtain money or property on behalf of their employer and to those who personally obtain money indirectly from the fraud. *See SEC v. Mudd*, 885 F. Supp. 2d 654, 669-70 (S.D.N.Y. 2012) (Section 17(a)(2) adequately pled where a defendant directly "obtained money or property for his employer while acting as its agent" or "personally obtained money indirectly from the fraud"), *quoting SEC v. Stoker*, 865 F. Supp. 2d 457, 463 (S.D.N.Y. 2012). Here, Synchrony Capital Group, and Lyons as its agent, obtained $700,000 directly from the Czech investors. And, Synchrony Capital GP, and Lyons as its agent, obtained $300,000 from Investor A. Furthermore, Lyons personally obtained money indirectly through his misappropriation of fund monies.

  ii.  *Scheme liability under Exchange Act Section 10(b) and Rule*
      *10b-5(a) and (c), and Securities Act Sections 17(a)(1) and (3)*

   Lyons and his Synchrony adviser entities also orchestrated a scheme to mislead investors by concealing the misappropriation of Value Fund assets. Scheme liability under Sections 17(a)(1) and 17(a)(3) of the Securities Act and Section 10(b) of the Exchange Act and Rules 10b-5(a) and (c) thereunder generally requires a showing that the defendant committed a manipulative or deceptive act in furtherance of the alleged scheme to defraud. *See, e.g., SEC v. Lee*, 720 F. Supp. 2d 305, 325 (S.D.N.Y. 2010).[2] Scienter is required (except under Section 17(a)(3), which requires a showing of negligence). Here, Lyons and his adviser entities engaged in a Ponzi-like scheme to use one investor fraud to cover up another. Lyons and Synchrony Capital engaged in a misappropriation fraud that stole hundreds of thousands of dollars from the Value Fund. Donahue Decl., ¶¶41-45 (at end of March 2018 Lyons became 90% owner of Synchrony Capital after two co-owners abandon fund); Alex Decl., ¶¶14-15, 20 (detailing Lyons' use of Value Fund monies for personal expenses). To cover up that fraud, Lyons and Synchrony Capital GP engaged in an offering fraud that raised $125,000 from Investor A, and used $100,000 of that fraudulently obtained money to pay back the Value Fund. *See* Statement of Facts, Section V, p.8, *supra* (detailing use of offering fraud funds to repay Value Fund). This use of one investor fraud to conceal another is a deceptive act that forms the basis of scheme liability. *See Burnett v. Rowzee,* 561 F. Supp. 2d 1120, 1127-28 (C.D. Cal. 2008) (Ponzi payments are a deceptive act for purposes of Rule 10b-5(a) and (c)).

---

[2.] As the Supreme Court recently clarified, the subparts of Section 17(a) and Rule 10b-5 are "mutually supporting rather than mutually exclusive." *Lorenzo v. SEC*, Slip Opinion, No. 17-1077 (Mar. 27, 2019) (rejecting the argument that the only way to be liable for false statements is through those provisions of the antifraud laws or rules "that refer *specifically* to false statements" because "this Court and the Commission have long recognized considerable overlap among the subsections of [Rule 10b-5] and related provisions of the securities laws… 'Each succeeding prohibition' was thus 'meant to cover additional kinds of illegalities—not to narrow the reach of the prior sections.'" Slip. Op. at 8-9 (citations omitted) (quoting *U.S. v. Naftalin*, 441 U.S. 768, 774 (1979)).

### C. Without an Injunction, Fund Investors Will Suffer Irreparable Harm

The need for a preliminary injunction is particularly acute here. While economic loss does not typically equate to irreparable harm, it does exist where it is "highly unlikely that any economic losses will be recoverable as a practical matter." *See Planned Parenthood of Northern New England v. City of Manchester*, 2001 WL 531537, *9 (D.N.H. 2001). Here, Lyons and his Synchrony adviser entities are basically insolvent. That is why they have misappropriated money from the hedge funds to whom they owe a fiduciary obligation. Indeed, Lyons admitted that he took money from the Value Fund because he did not have any other income source to support his lifestyle and had no assets more than worth more than $1,000. Donahue Decl., Ex. 1 (Lyons IT), 87:5-11; 89:8-19, 254:19-255:21. On the other hand, Lyons has already misappropriated approximately $700,000 and currently has access to the remaining $120,000 that is in the Global Marco Fund's bank account. As a practical matter, it is highly unlikely that any of these, or any possible future, investor losses will be recoverable from these defendants. Further, the remaining fund investors face serious risk of further irreparable harm if the Court does not issue a temporary restraining order prohibiting Lyons and his Synchrony adviser entities from further raiding what is left of the Global Macro Fund.

The Commission further notes that two of the remaining investors are retirees. Curtin Decl., ¶¶15, 22. As the First Circuit has explained, retired workers living on fixed incomes are not ordinary victims. *See United Steel Workers of America, AFL-CIO v. Textron*, 836 F.2d 6, 8 (1st Cir. 1987) (observing retired workers are uniquely entitled to protection from irreparable harm in the form of "emotional distress, concern about potential financial disaster, and possibly deprivation of life's necessities . . . .") *Id*. A temporary restraining order is necessary to protect these uniquely vulnerable victims from economic losses that may not be recoverable.

25

### D.  Balance of Harms Favors Issuance of the Temporary Restraining Order

The Commission's requested injunctive relief would prevent Lyons and his adviser entities from continuing to violate the federal securities laws.  The Commission anticipates that the defendants may assert harm in the form of disruption of business relationships with current clients or investment management activities.  These arguments, however, should be viewed in light of the existing record showing the defendants' misconduct misappropriating client assets and making false and misleading statements to potential investors.  Further, Lyons and his adviser entities currently have only one hedge fund with assets – the Global Macro Fund.  And, its assets are sitting in cash in a bank account.  The issuance of an injunction prohibiting future securities law violations will preserve these assets for remaining investors.  Given that the Commission is seeking injunctive relief to enforce laws to protect remaining investors, and to prevent the possibility of further dissipation of their assets, the balance of the harms weighs in favor of an injunction.

### E.       A Temporary Restraining Order Is In The Public Interest.

The requested injunction is also in the public interest.  It will protect the defendants' investment adviser clients by preventing Lyons from further misappropriating fund monies or committing offering frauds to replace monies that he has already taken.  It will require compliance with securities laws that are designed to promote integrity in the relationship between an investment adviser and his clients.  Granting the requested injunction will not harm either the general public, or the defendants' existing clients, in any way.

Accordingly, the Court should adopt paragraphs I through IV of the Commission's proposed temporary restraining order.

## II.    AN ORDER FREEZING ASSETS AND ENTERING OTHER EQUITABLE RELIEF IS NECESSARY AND APPROPRIATE

### A.    The Need for an Asset Freeze and Order Prohibiting Accepting New Investments

The Commission seeks an asset freeze (1) to preserve assets for existing fund investors, and (2) to preserve assets in the defendants' possession that may be able to be distributed as remedies to victims. First, the record shows that there is approximately $120,000 remaining in the bank account of relief defendant Synchrony Global Macro Fund. Alex Decl., ¶21. Lyons has already admitted that he took fund assets for personal expenses based on "existing need." Donahue Decl., Ex. 1 (Lyons IT), ¶253:7-10. And, from the bank accounts Lyons has disclosed to the Commission, it appears his is insolvent. Alex Decl., ¶22. An asset freeze of the Global Macro Fund's account is necessary to protect what is left of the fund for distribution to investors. *See Micro Signal Research Inc. v. Otus*, 417 F.3d 28, 31 (1st Cir. 2005) (recognizing that irreparable harm may be shown "where there is a strong indication that the defendant may dissipate or conceal assets."). Second, there is a possibility that Lyons or his Synchrony adviser entities have Investor A's money in an account that the Commission has not seen yet. The Commission has yet to find the account in which the defendants deposited Investor A's second investment of $175,000. During testimony earlier this month, Lyons admitted that he has recently opened a bank account at Cambridge Trust Company,[3] Donahue Decl., Ex. 1 (Lyons IT), 289:19-25;  290:1-13,  but the Commission has not subpoenaed that account for fear that notice of that subpoena might cause Lyons to drain that account. Accordingly, an asset freeze of

---

3 Prior to testimony, the Commission had asked Lyons fill out a questionnaire disclosing all accounts he owned. *See* Donahue Decl, Ex. 27 (Lyons Background Questionnaire), p.5, Question 18. He did not disclose the Cambridge Trust Company Bank account on the form. He only disclosed the account when directly asked during testimony if there was any account on that he failed to disclose on the form. Donahue Decl, Ex. 1 (Lyons IT), 289:19-290:7.

defendants' accounts is necessary so that the Commission can freeze any remaining assets that it currently has information about or discovers after the filing of this motion.

Further, the Commission seeks an order prohibiting Lyons and his Synchrony adviser entities from accepting investments from actual or prospective investors pending the resolution of this action. As explained in Section V of the Statement of Facts, *supra*, Lyons and Synchrony Capital GP engaged in an offering fraud as recently as last month. Given their recent fraudulent conduct in selling securities, and Lyons current financial insecurity, the Commission contends that an order prohibiting the defendants from accepting new investments is necessary for protection of the investing public.

.Accordingly, the Court should adopt paragraphs V through VI and paragraph VIII of the Commission's proposed order.

## B.     The Need for an Accounting

To assess the scope of the fraud and trace the defendants' receipt and disposition of client funds during the fraud, courts often order defendants in Commission enforcement actions to provide an immediate accounting of all money or property obtained as a result of fraudulent activity, as well as their current assets or other resources. *See, e.g.*, *SEC v. Manor Nursing*, 458 F.2d 1082, 1105 (2d Cir. 1972); *SEC v. Bremont*, 954 F. Supp. 726, 733 (S.D.N.Y. 1997); *SEC v. Oxford Capital Secs., Inc.*, 794 F. Supp. 104, 105-06 (S.D.N.Y. 1992). Here, the record shows the Lyons and his Synchrony adviser entities engaged in misappropriation in all three funds – the Value Fund, the Capital Partners Fund, and the Global Macro Fund. And, to complicate matters, in or about August 2018, Lyons and Synchrony Capital GP took at least $100,000 of the money they obtained from Investor A and paid it to the Value Fund. And, then in October 2018, Lyons and Synchrony Capital GP transferred all of the assets from the Value Fund to the Global Macro

28

Fund.  At the least, an accounting is necessary to help figure out how much of the Global Macro Fund represents assets of Value Fund investors, and how much is ill-gotten gains from the fraud perpetrated on Investor A.  Further, in light of Lyons' and Synchrony Capital GP's misconduct in offering sales of shares in the adviser entity as recently as last month, an accounting of any other such sales for any Synchrony adviser entity is necessary to ensure there are no other defrauded investors or ill-gotten gains in the Global Macro Fund.

Accordingly, the Court should adopt paragraph VII.

### C.      The Need for Order Preventing the Alteration or Destruction of Documents

The Commission seeks an order preventing defendants and any of their agents from altering or destroying documents.  Given the serious nature of the violations in this case, such an order is warranted to protect the Commission's ability to prove its case and to obtain the relief sought.  Accordingly, the Court should adopt paragraph IX of the Commission's proposed order.

### D.      The Need for Expedited Discovery

The Commission requests permission to conduct expedited discovery.  At present, the Commission seeks to issue a subpoena for bank records to Cambridge Trust Company, which may hold funds from Investor A's second investment of $175,000.  The Commission will also use discovery to pursue any further leads on investor funds or other currently unidentified victims that may arise from the defendants' accounting.  Such discovery is appropriate so that the Commission can present a more complete evidentiary record to the Court at the hearing on its request for a preliminary injunction.  Accordingly, the Court should adopt paragraph X of the Commission's proposed order.

## <u>CONCLUSION</u>

For the foregoing reasons, the Commission requests this Court issue a temporary restraining order, order freezing assets and order for other equitable relief in the form submitted.

Respectfully submitted,

SECURITIES AND EXCHANGE COMMISSION

By its attorneys,


/s/Richard M. Harper II
Richard M. Harper II (Mass. Bar No. 634782)
Robert Baker (Mass. Bar No. 654023)
Sue Curtain (Mass. Bar No. 554550)
William Donahue (Mass. Bar No. 631229)
Attorneys for Plaintiff
**SECURITIES AND EXCHANGE COMMISSION**
Boston Regional Office
33 Arch Street
Boston, MA 02110
(617) 573-8979 (Harper direct)
(617) 573-4590 (fax)
harperr@sec.gov (Harper email)

Dated: April 22, 2019